UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
DEBORAH L. DAVIS,

                        Plaintiff,

-against-

OYSTER BAY-EAST, NORWICH CENTRAL
SCHOOL DISTRICT, OYSTER BAY-EAST,
NORWICH CENTRAL SCHOOL BOARD,
DR. GEORGE J. CHESTERTON in his official
and individual capacity, REBECCA QUARM
in her official and individual capacity, ALLISON
BROWN in her official and individual capacity,

                        Defendants.
-------------------------------------------------------X

03-cv-1372
(SJF) (JO)

**OPINION & ORDER**

FEUERSTEIN, J.

I.       Introduction

       Plaintiff Deborah Davis ("Plaintiff" or "Davis") commenced this action against defendants Oyster Bay-East, Norwich Central School District (the "School District"), Norwich Central School Board (the "School Board"), Dr. George J. Chesterton, Rebecca Quarm and Allison Brown (collectively, "Defendants") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"), 42 U.S.C. §§ 1981, 1983, 1985 and 1986, the New York State Human Rights Law § 295 *et seq.* ("NYHRL") and breach of contract. Defendants move for summary judgment on all counts pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, Defendants' motion for summary judgment is granted.

## II. Background

Plaintiff, an African-American woman, was hired by the School District in 1987 as a Stenographer for the Oyster Bay-East Norwich High School. (Cmplt. ¶ 10; Def. 56.1 Stmt. ¶ 1, Pl 56.1 Stmt. ¶ 1). In 1989, Plaintiff was transferred by the School District, initially on a temporary and then on a permanent basis, to Theodore Roosevelt Elementary School. (Def. 56.1 Stmt. ¶ 2, Pl. 56.1 Stmt. ¶ 2). Plaintiff was briefly transferred from Theodore Roosevelt to another school in 1992, but, upon request, was permitted to return to Theodore Roosevelt after several months. (Def. 56.1 Stmt. ¶ 3, Pl. 56.1 Stmt. ¶ 3). From approximately 1990 to 2000, Plaintiff's immediate supervisor at Theodore Roosevelt was Principal Dennis Moller. (Def. 56.1 Stmt. ¶ 4; Pl. 56.1 Stmt. ¶ 4). It is undisputed that Plaintiff performed functions beyond those normally performed by a stenographer, although the parties differ in their characterizations of this additional work. (Def. 56.1 Stmt. ¶¶ 31-35; Pl. 56.1 Stmt. ¶¶ 31-35). It is also undisputed Plaintiff and Principal Moller had a functional working relationship. (Def. 56.1 Stmt. ¶ 32; Pl. 56.1 Stmt. ¶ 32).

At some point during or prior to November 2000, Principal Moller ceased to serve as principal of Theodore Roosevelt. (Def. 56.1 Stmt. ¶ 5; Pl. 56.1 Stmt. ¶ 5). During the search for a replacement principal, Dr. Phyllis Harrington served as interim-principal at Theodore Roosevelt.[1] Early in her term as interim-principal, in November 2000, Dr. Harrington proposed transferring Plaintiff to the Special Education Department. (Def. 56.1 Stmt. ¶ 10; Pl. 56.1 Stmt.

---

[1]Plaintiff disputes Defendants' assertion that "Dr. Harrington assumed the position of principal . . . for an interim period," (Def. 56.1 Stmt. ¶ 9), and instead "denies that Dr. Harrington actually assumed the position of principal for an interim period, and avers that Dr. Harrington instead would periodically check up on the school." (Pl. 56.1 Stmt. ¶ 10). This dispute is immaterial, and the Court need not and does not address whether Dr. Harrington fulfilled her duties as interim-principal.

¶ 10). Plaintiff declined Harrington's offer, however, and was permitted to continue in her position at Theodore Roosevelt. (Id.).

While serving as interim-principal, Harrington claims she developed "a very strong sense from working with [Plaintiff] that . . . [Plaintiff] felt that she ran the building to some extent." (Kleinberg Decl., Ex. F, 28:9-12). According to Harrington, Plaintiff performed tasks "that, in my opinion, were responsibilities of the building principal . . . like writing memos to teachers under her name . . . ." (Id., 28:13-14, 17-18). Plaintiff denies this allegation, but does admit that she "took a leadership role in her job . . . ." (Pl. 56.1 Stmt. ¶ 9). According to Defendants, Harrington also noted Plaintiff's failure to timely keep track of staff attendance, one of the responsibilities of her position. (Def. 56.1 Stmt. ¶ 39). Plaintiff denies this allegation. (Pl 56.1 Stmt. ¶ 39).[2]

In March 2001, the School District hired Allison Brown as the new principal of Theodore Roosevelt. (Def. 56.1 Stmt. ¶ 11; Pl. 56.1 Stmt. ¶ 11). As principal, Brown was Plaintiff's immediate supervisor. (Id.). According to Defendants, shortly after Brown became principal, she received a number of complaints from both teachers and parents regarding Plaintiff's demeanor. (Def. 56.1 Stmt. ¶¶ 14, 17, 18). Defendants also claim that Brown "had her own run-ins with plaintiff . . . relat[ing] to various issues . . . [such as] plaintiff's tardiness . . . [and] refus[al] to work before the clock struck eight a.m." on days when she was not tardy. (Def. 56.1 ¶¶ 19, 20). Plaintiff denies these allegations. (Pl. 56.1 Stmt. ¶¶ 14, 17-20).

---

[2]In addition to denying that Plaintiff failed to timely maintain attendance sheets, Plaintiff "further avers that the defendant Allison Brown was partially responsible for any lag in the submission of staff attendance sheets, due to her failure to hand in necessary items for the completion of said attendance." (Pl. 56.1 Stmt. ¶ 39). Plaintiff's averment that Brown was responsible for the untimely attendance sheets during Harrington's tenure defies logic, however, as Brown had not become principal when Harrington was serving as interim-principal. In any event, however, Plaintiff has generally denied the contents of paragraph 39.

According to Defendants, Brown attempted to speak with Plaintiff about the complaints, her demeanor and general behavior, (Def. 56.1 Stmt. ¶ 22), but Plaintiff continued to perform inappropriately. For example, Defendants claim that Plaintiff refused to perform required functions, including answering phones, maintaining staff attendance, promptly sending time-sensitive letters and properly maintaining Brown's calendar. (Def. 56.1 Stmt. ¶¶ 22, 23, 30). In addition to Plaintiff's alleged tardiness and refusal to perform required functions, Defendants cite Plaintiff's alleged disappearance from a Field Day event as evidence of her continued poor performance. (Def. 56.1 Stmt. ¶ 37). Plaintiff denies that she performed poorly or refused to perform required tasks, (Pl. 56.1 Stmt. ¶¶ 22, 23, 30, 37), and claims that on the Field Day in question, she "had merely taken an early [off-site] lunch break with some parents, had called in to inform the school, and then encountered a situation whereby the person who drove Plaintiff to lunch learned of the death of her father-in-law." (Pl. Mem. in Opp. at 7; Davis Decl. ¶¶ 36-39). Neither party has indicated whether Plaintiff was required to obtain permission to take an early lunch break off the school premises and, if so, whether such permission was granted.

Plaintiff claims that Brown began harassing her, and scrutinizing and criticizing her work almost immediately upon becoming principal. (Pl. 56.1 Stmt. ¶¶ 92, 112-114, 117). According to Plaintiff, Caucasian employees were not subjected to similar scrutiny and criticism. (Id. ¶¶ 92, 112, 114-115, 117). Furthermore, Plaintiff claims that Brown told her that parents were afraid to call Brown's office because of Plaintiff, and parents were also afraid of the "only other African-American teacher at the school, Mr. Thomas Robinson."[3] (Pl. 56.1 Stmt. ¶ 93). Defendants deny that Brown stated that parents were afraid to call her office because of Plaintiff.

---

[3]Plaintiff's reference to Robinson as "the only other African-American teacher at the school" appears to imply that Plaintiff was also a teacher. There are neither allegations nor evidence to this effect, however.

(Def. 56.1 Stmt. ¶ 93). Defendants further state that Brown had received complaints from parents who had witnessed Robinson, a physical education teacher, "punishing students by denying them gym class, [and] making them walk in a line down a hallway for the entire period." (Def. Reply Mem. in Supp. at 5; Def. 56.1 Stmt. ¶ 93). Thus, Defendants claim, it was Robinson's improper practice, and not his race, that prompted the parental complaints and Brown's alleged comment regarding those complaints. (See also Pelle-Beer Decl., Ex. C.) (May 16, 2001 email from Allison Brown to Arnold Minkoff) ("As we have discussed a few times before, I am getting several complaints about Mr. Robinson and the way he treats the children. A mother made an appointment with me yesterday to discuss Mr. Robinson's 'mean ways' and how her child 'hates' phys. ed. I want to give you a heads up because she and many other parents are planning to write letters stating their concerns.")

In July 2001, Brown spoke with Dr. Chesterton, the Superintendent of the School District, regarding her relationship with Plaintiff. (Def. 56.1 Stmt. ¶ 42). According to Brown, she sought "advice, [be]cause I wanted it to work. I knew that we were . . . going to be in it for a long time together." (Kleinberg Decl., Ex. G, 126:4-25, 127:2-16). Defendants claim that Chesterton informed Brown that he "was already aware of complaints made about plaintiff's demeanor and conduct and had previously asked then-Principal Moller to give direction to plaintiff so she would interact better with parents and other visitors at the school." (Def. 56.1 Stmt. ¶ 42). Plaintiff denies that she was so advised. (Pl. 56.1 Stmt. ¶ 42).[4]

---

[4] In fact, Plaintiff claims that she "cannot admit or deny the existence of, or substance of, any alleged conversations between defendants Brown and Chesterton." (Pl. 56.1 Stmt. ¶ 42). Later in the same sentence, however, Plaintiff "denies the allegation that Principal Moller was instructed to give 'direction' to Plaintiff to interact better with parents and visitors of the school." (Pl. 56.1 Stmt. ¶ 42). Plaintiff does not explain why she lacks information sufficient to admit or deny one conversation at which she was not present, but apparently possesses sufficient information to deny the existence of another.

Harrington testified at her deposition that, although she was working elsewhere in the School District during the summer of 2001, she "was aware that there were things that Ms. Brown needed to get accomplished and that were hindered by Ms. Davis' work." (Kleinberg Dec., Ex. F, 41:11-25, 42:2-14). Plaintiff denies there was a "'breakdown' in the relationship between Brown and Plaintiff," (Pl. 56.1 Stmt. ¶ 46), and instead claims that Brown "harassed and scrutinized Plaintiff from the beginning of Brown's employment as Principal, and never allowed any 'relationship' to evolve . . . ." (Id.).

According to Chesterton, he advised Plaintiff in July 2001 that he had decided to transfer her to the high school because "it was simply not working out between plaintiff and Ms. Brown." (Def. 56.1 Stmt. ¶ 43; Pl. 56.1 Stmt. ¶ 43).[5] As Chesterton explained at his deposition, "I had made a decision to transfer Mrs. Davis from the Roosevelt School to the high school because of concerns that I had in terms of the working relationship at the Roosevelt Elementary School . . . There was a difficulty working with a new principal . . . ." (Kleinberg Decl., Ex. E, 23:21-25, 33:2-25, 34 2). Defendants claim that Brown had not requested Plaintiff's transfer and, indeed, that Brown was not even aware of the transfer until after it was effected. (Def. 56.1 Stmt. ¶ 44). Plaintiff acknowledges that she is not aware of any evidence to the contrary, (Pl. 56.1 Stmt. ¶ 44) ("Plaintiff cannot admit or deny the allegations with respect to the scope of defendant Allison Brown's role in Plaintiff's transfer . . . ."), and instead "avers that said question is an unresolved, triable issue of fact." (Pl. 56.1 Stmt. ¶ 44). Neither Plaintiff's salary nor her benefits were affected by the transfer. (Def. 56.1 Stmt. ¶ 56; Pl. 56.1 Stmt. ¶ 56).

---

[5]While Plaintiff denies (1) "the implicit allegation by defendants that she caused any 'relationship problems' with defendant Brown," (Pl. 56.1 Stmt. ¶ 43), and (2) "that Dr. Chesterton informed Plaintiff that the transfer was due to a vacancy being open," (id.), she does not deny that Dr. Chesterton stated that at least one reason for her transfer was the breakdown in her relationship with Brown. (Def. 56.1 Stmt. ¶ 43; Pl. 56.1 Stmt. ¶ 43).

In early August 2001,[6] Plaintiff sent a letter to the School District advising that she suffered from Posttraumatic Stress Disorder relating to a "blood phobia," and requesting an accommodation under the ADA. (Def. 56.1 Stmt. ¶ 49; Pl. 56.1 Stmt. ¶ 49). Attached to the August 7, 2001 letter was an August 1, 2001 letter from Paul Ebron, CSW, in which Mr. Ebron stated that Plaintiff "has been receiving psychotherapy treatment from September 1996 to the present and has been diagnosed with Posttraumatic Stress Disorder with delayed onset." (Kleinberg Decl., Ex. P). The letter does not state the cause, scope or effects of Plaintiff's Posttraumatic Stress Disorder ("PTSD"). (Id.). Defendants dispute that Plaintiff was receiving treatment for her alleged blood phobia, and claim that Plaintiff's therapy and medication were prescribed prior to her transfer and for reasons unrelated to her alleged blood phobia. (Def. 56.1 Stmt. ¶¶ 50-55). Plaintiff denies these allegations, (Pl. 56.1 Stmt. ¶¶ 50-55), but does concede that she was prescribed Xanax, at least in part, to treat problems other than her alleged blood phobia. (Pl. 56.1 Stmt. ¶ 52).

Plaintiff's supervisor at the High School was principal Rebecca Quarm. (Def. 56.1 Stmt. ¶ 57; Pl. 56.1 Stmt. ¶ 57). Quarm assigned Plaintiff a number of administrative tasks, (Def. 56.1 Stmt. ¶ 58; Pl. 56.1 Stmt. ¶ 58), including maintaining records, coordinating student physicals, and performing tasks she had performed in her previous position, such as answering phones and scheduling appointments. (Def. 56.1 Stmt. ¶ 59). According to Plaintiff, however, her

---

[6]Both Plaintiff's and Defendant's Rule 56.1 Statements state that Plaintiff's letter was dated August 1, 2001. (Def. 56.1 Stmt. ¶ 49; Pl. 56.1 Stmt. ¶ 49). The supporting documentation to which both parties refer, Defendant's Exhibit O, is a letter dated August 7, 2001. (Kleinberg Decl, Ex. O). While paragraph 49 of Defendant's Rule 56.1 appears to suggest the existence of two letters, and the August 7, 2001 makes reference to some previous communication, (Kleinberg Decl., Ex. O) ("To reiterate my discussion . . . ."), it is not clear whether the August 7 letter is a second letter or merely a follow-up to a conversation or other communication.

responsibilities in the nurse's office were "out of title" and, furthermore, her blood phobia prevented her from working in that office. (Cmplt. ¶¶ 36, 40).

Shortly after her transfer to the High School, Plaintiff filed a complaint with the Nassau County Civil Service Commission ("NCCSC"), alleging that her new position was out of title. (Def. 56.1 Stmt. ¶ 56; Pl. 56.1 Stmt. ¶ 56).[7] On April 29, 2002, the NCCSC sent a letter to Dr. Chesterton, in which it summarized its findings regarding Plaintiff's allegations and advised him "that certain duties assigned to [Plaintiff] were inappropriate." (Pelle-Beer Decl., Ex. G) (July 11, 2003 Letter from NCCSC to Chesterton). After a series of letters between Plaintiff, Chesterton, the NCCSC, the CSEA and others, Plaintiff's job responsibilities within the nurse's office were altered in an attempt, according to Defendants, to comply with the NCCSC's findings. (See generally Pelle-Beer Decl., Ex. G). In approximately July or August 2003, Plaintiff was transferred, upon the request of the NCCSC, out of the High School nurse's office. (Def. 56.1 Stmt. ¶ 65; Pl. 56.1 Stmt. ¶ 65). Plaintiff was reassigned to the Special Education Department, where she is presently employed. (Def. 56.1 Stmt. ¶ 66; Pl. 56.1 Stmt. ¶ 66). However, Plaintiff claims that this position is also 'out of title.' (Pl. 56.1 Stmt. ¶ 65).

III.    Summary Judgment Standard

---

[7]The Civil Service Employees Association ("CSEA") sent a letter to Dr. Chesterton on August 8, 2001, objecting to Plaintiff's transfer and providing notice of "a violation of Article XVIII of the Collective Bargaining Agreement . . . ." (Pelle-Beer Decl., Ex. G). The School District, through counsel, responded on August 21, 2001, denying that the transfer violated the Collective Bargaining Agreement and refusing to reconsider the transfer. (Pelle-Beer Decl., Ex. N). Deborah Welt, a Personnel Specialist III at the NCCSC, testified that an October 1, 2001 letter from Plaintiff "is the first document" received by the NCCSC. (Kleinberg Decl., Ex. N, 22:13-14). She further testified that, based on the contents of that letter, she inferred that Plaintiff had, at some point in September 2001, "called on the phone and was told to put her complaint in writing." (Id., 22:17-18, 22-25; 23:1; see also Pelle-Beer Decl., Ex G (October 1, 2001 Letter from Plaintiff to Karl Kampe).

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material "if it might affect the outcome of the suit under the governing law." Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). An issue of fact is genuine only if a jury could reasonably find in favor of the nonmoving party based on that fact. Id. The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to establish the existence of a factual question that must be resolved at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The trial court is required to construe the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor. Id. at 252; Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

The Second Circuit has recognized that direct evidence of discriminatory intent is rare, and often must be inferred from circumstantial evidence found in the pleadings. Holtz, 258 F.3d at 69. Thus, while summary judgment may be appropriate in such cases, it should be done with an extra measure of caution. Id. (citing McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997)); see also Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

IV.   Analysis

A.    Disability Claims

    1.    Americans With Disabilities Act

Plaintiff claims that her PTSD and blood phobia constitute a disability within the meaning of the ADA, thereby entitling her to the protections afforded by that statute. Defendants move for summary judgment on the ground that, inter alia, Plaintiff's alleged blood phobia and PTSD are not statutorily-recognized disabilities.

The ADA prohibits, inter alia, workplace discrimination "against a qualified individual with a disability because of the disability of such individual . . . ." 42 U.S.C. § 12112(a); see also Felix v. New York City Transit Auth., 324 F.3d 102, 104 (2d Cir. 2003). A disability is defined under the ADA as "a physical or mental impairment that substantially limits one or more of the major life activities . . . ." 42 U.S.C. § 12102(2)(A). Discrimination is defined under the statute as, inter alia, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. 12112(b)(5)(A).

A plaintiff seeking to enforce the requirements of §§ 12112(a) and (b) must therefore first establish that she suffers from a qualifying disability. As the Second Circuit explained in Felix, "[o]ther impairments that do not amount to a 'disability' as defined by 42 U.S.C. § 12102(2)(A) do not require accommodation under the ADA." Felix, 324 F.3d at 105. Therefore, assuming without deciding that Plaintiff suffers from the alleged blood phobia and PTSD,[8]

---

[8]Defendant disputes that Plaintiff suffers from the alleged phobia and PTSD. The Court need not decide this issue, however, because, as discussed herein, the alleged phobia and PTSD, even if true, is not a disability within the meaning of the ADA.

Plaintiff will only be able to invoke the protections of the ADA if she can show that the phobia and PTSD substantially limits a major life activity.

Plaintiff has identified working as her allegedly substantially limited major life activity. (Pl. Mem. in Opp. at 15). It is well-established that working is a valid major life activity under the ADA. 29 C.F.R. § 1630.2(i); Muller v. Costello, 187 F.3d 298, 312 (2d Cir. 1999); Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 642 (2d Cir. 1998). However, under the relevant EEOC regulations, which are entitled to "great deference" in the Second Circuit, Muller, 187 F.3d at 312, a plaintiff's ability to work will only be substantially limited if she is "significantly restricted in the ability to perform *either a class of jobs or a broad range of jobs in various classes* as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i) (emphasis added). Thus, "[i]f the plaintiff establishes only 'the inability to perform a single particular job,' he has failed to establish a substantial impairment to his major life activity of working." Muller, 187 F.3d at 312 (quoting 29 C.F.R. § 1630.2(j)(3)(I)). The EEOC regulations identify three criteria to be considered when determining whether a plaintiff's ability to work is substantially limited:

> (A) The geographical area to which the individual has reasonable access;
>
> (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
>
> (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

11

29 C.F.R. § 1630.2(3)(ii)(A)-(C).

In the instant case, Plaintiff has failed to demonstrate that her alleged blood phobia and PTSD preclude her from performing a "class of jobs or a broad range of jobs in various classes . . . ." 29 C.F.R. § 1630.2(j)(3)(i). Rather, they allegedly limit her ability to perform the type of "single, particular job" that is outside the scope of the ADA. Id.; Muller, 187 F.3d at 313. In Muller, the Second Circuit rejected the ADA claim of a correctional officer who allegedly could not work near cigarette smoke. The Court held that "[t]he position of correctional officer constitutes a single, particular job, and a limitation on a particular job cannot constitute a substantial limitation of the major life activity of working." Id. at 313. In reaching this conclusion, the Court noted that other courts have held that disabilities precluding an individual from working as a pilot, a police officer and a firefighter were all particularized jobs, and therefore not actionable under the ADA. Id. (citing, inter alia, Witter v. Delta Air Lines, Inc., 138 F.3d 1366, 1370-71 (11th Cir. 1998), Miller v. City of Springfield, 146 F.3d 612, 615 (8th Cir. 1998), Daley v. Koch, 892 F.2d 212, 215 (2d Cir. 1989), and Bridges v. City of Bossier, 92 F.3d 329, 334-36 (5th Cir. 1996)).

In Anderson v. North Dakota State Hospital, 232 F.3d 634 (8th Cir. 2000), the plaintiff was a switchboard operator at a hospital who refused to return to work after learning that "a snake had been seen in her work area . . . ." Id. at 635. According to plaintiff, she was "entitled to the protection of the ADA because of her fear of snakes," id. at 636, claiming that her phobia substantially limited, inter alia, her ability to work because "her condition prevents her from working in an environment where snakes may be present . . . ." Id. The Eighth Circuit rejected this argument on the ground that plaintiff's fear of snakes was not a substantial limitation on plaintiff's ability to work. Id. Specifically, the Court held that

12

[f]or Ms. Anderson to show that her ability to work has been substantially limited by her fear of snakes, . . . she must show that she cannot work in a broad class of jobs. Viewing the record in the light most favorable to Ms. Anderson, she has at most shown that she is incapable of working as a switchboard operator for the hospital. She has offered no evidence of any other job, much less a broad range of jobs, at which she could be prevented from working because of her fear of snakes.

Id. (internal citations and quotations omitted). In Sinkler v. Midwest Property Management Ltd., 209 F.3d 678 (7th Cir. 2000), the Seventh Circuit held that a plaintiff's phobia of "driv[ing] in an unfamiliar area" that allegedly caused "spontaneous panic attacks" did not substantially limit her ability to work as a sales person because "an inability to perform a particular job for a particular employer is insufficient to establish substantial limitation. Instead, the impairment must substantially limit employment generally." Id. at 685 (internal citations and quotations omitted).

Plaintiff has failed to demonstrate that her alleged blood phobia and PTSD substantially limit her ability to work within the meaning of the ADA. Indeed, it is quite clear from Plaintiff's employment history that her impairment, at most, precludes her from performing a "single, particular job." 29 C.F.R. § 1630.2(j)(3)(i). She therefore does not have a disability within the meaning of the ADA, and her claim is dismissed.[9]

B.    First Amendment

A plaintiff alleging First Amendment retaliation bears the initial burden of establishing a prima facie case "(1) that the speech or conduct at issue was protected, (2) that the defendant

---

[9]Plaintiff appears to also assert a Title VII claim on the basis of her alleged disability. See Cmplt. ¶ 52 ("[Defendant's] discriminatory practice based on . . . disability . . . violates Title VII . . . ."); see also id. ¶¶ 55, 56. However, Title VII proscribes discrimination only on the basis of "individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000e-2(a)(1). Because discrimination based on disability is not actionable under Title VII, see Julian v. New York City Transit Auth., 857 F. Supp. 242, 248 (E.D.N.Y. 1994); Fiore v. City of New York, 97-cv-4935, 1998 U.S. Dist. LEXIS 16818, at *3 (S.D.N.Y., Oct. 26, 1998), Plaintiff's Title VII claim based on alleged disability discrimination is dismissed.

took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Scott v. Coughlin, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing, inter alia, Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002)). In order to satisfy this requirement, a plaintiff must show "that an improper motive played a substantial part in defendant's action." Scott, 344 F.3d at 288. If the plaintiff is able to establish a *prima facie* case, "[t]he burden then shifts to defendant to show it would have taken exactly the same action absent the improper motive." Id. (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

In order to satisfy the first prong, Plaintiff must establish that she engaged in speech regarding "a matter of public concern." Feingold v. New York, 366 F.3d 138, 160 (2d Cir. 2004). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement . . . ." Connick v. Myers, 461 U.S. 138, 147-148 (1983). In application, the Court must determine whether the speech at issue can be "fairly considered as relating to any matter of political, social, or other concern to the community." Id. at 146. While speech need not be political to be protected, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Id. at 147; see also Tiltti v. Weise, 155 F.3d 596, 603 (2d Cir. 1998) ("expressing dissatisfaction with working conditions is not, by itself, speech on matters of public concern.")

In the instant case, Plaintiff alleges her statement that "[t]he welfare of the students can be jeopardized as a result of my being misplaced in a health related environment" to be

14

constitutionally protected speech. (Kleinberg Decl., Ex. O). According to Plaintiff, this statement reflected her concern over "the possible danger that the students of the school were facing because of [her] post traumatic stress disorder, which causes an emotional and physical reaction brought on by the sight of blood." (Pl. Mem. in Opp. at 19). However, Plaintiff's complaint regarding her position in the school nurse's office was clearly an "expressi[on of] dissatisfaction with working conditions" and it is therefore outside the protections of the First Amendment. Tiltti, 155 F.3d at 603; see also Davis Decl. at ¶ 48 ("[T]he transfer was a demotion. I was now relegated to a lower status position in the clerical rung. As a result, the transfer to the Grade 1 position left me with fewer chances for promotions . . . . I also had fewer opportunities, if I were to have left the school district . . . . This demotion effectively negated the opportunities that I had built up for myself, by working at various Fortune 500 companies for over twenty years prior to entering the defendant school district."). In Ezekwo v. New York City Health & Hosps. Corp., 940 F.2d 775, 781 (2d Cir. 1991), Plaintiff's complaints that she had been denied a promotion "were personal in nature and generally related to her own situation . . . . [Plaintiff] was not on a mission to protect the public welfare."[10] Id. at 781; see also Connick, 461 U.S. at 148 (finding unprotected speech arising out of "one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause celebre.") Plaintiff's speech did

---

[10]The plaintiff in Ezekwo complained specifically of "(1) the failure of attending physicians and lecturers to be present at scheduled times, (2) the manner in which she was treated by [a senior doctor] and the attending physicians, (3) the manner in which [the senior doctor] evaluated her performance, (4) her lack of opportunity to perform surgery, (5) the lack of personal attention she received from the attending physicians, (6) the lack of proper hospital maintenance, (7) [the senior doctor's] poor management and motivational skills, and (8) the poor teaching methods of the attending physicians." Id. at 777-78.

15

not address a matter of public concern and her First Amendment retaliation claim is therefore dismissed.[11]

## C. Race Claims[12]

### 1. Statutory Framework

Plaintiff has not offered any direct evidence of improper racial discrimination, and the three-step burden shifting analysis first established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) therefore applies. Under this analysis, Plaintiff must first establish a *prima facie* case of discrimination by showing "1) that [s]he belonged to a protected class; 2) that [s]he was qualified for the position [s]he held; 3) that [s]he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004). "Although a plaintiff's burden of establishing a prima facie case is de minimis, a Title VII plaintiff's claims nevertheless fail if she cannot make out a prima facie case of discrimination." Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 126 (2d Cir. 2004) (internal citations and quotations omitted).

---

[11]Furthermore, even assuming *arguendo* that Plaintiff's speech was protected, she has failed to identify any adverse action that ensued, or any causal connection between her allegedly protected speech and such adverse action. Indeed, the primary action of which Plaintiff complains - her transfer to the School Nurse's office - is the same action that precipitated her speech, thereby eliminating any possibility of a causal connection between the two. Finally, to the extent Plaintiff alleges she suffered from "prolonged placement in an out-of-title position, [was] continually denied accommodation, and harassment by principal Becky Quarm" as a result of her speech, (Pl. Mem. in Opp. at 19), she has offered no evidence in support of these conclusory allegations. Any claims based on this theory are therefore dismissed.

[12]Plaintiff's racial discrimination claims under Title VII, 42 U.S.C. §§ 1981 and 1983, and NYHRL § 296 are analyzed together, as the same analytic framework applies to each. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) (Title VII); Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989) (§ 1981) (superseded by statute on other grounds); Sorlucco v. New York City Police Dep't, 888 F.2d 4, 7 (2d Cir. 1989) (§ 1983); Weinstock v. Columbia Univ., 224 F.3d 33, 42 n. 1 (2d Cir. 2000) (NYHRL). Furthermore, because there was no intentional discrimination and the claims underlying Plaintiff's claims under §§ 1985 and 1986 are dismissed, the claims under those 'derivative' statutes are necessarily also dismissed. Brown v. City of Oneonta, 221 F.3d 329, 341 (2d Cir. 1999); Posr v. Court Officer Shield # 207, 180 F.3d 409, 419 (2d Cir. 1999).

Once a plaintiff establishes a *prima facie* case, "the employer is required to offer a legitimate, nondiscriminatory business rationale for its conduct." Feingold, 366 F.3d at 152. The defendant's burden is to produce, not persuade. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993); Patterson, 375 F.3d at 221 ("[T]he burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the termination . . . ."). "It is important to note, however, that although the McDonnell Douglas presumption shifts the burden of production to the defendant, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." St. Mary's Honor Center, 509 U.S. at 507.

Upon production of a nondiscriminatory motivation for the adverse action, the burden shifts back to the plaintiff, who must offer evidence that suggests that the defendant's proffered reason is a pretext for intentional discrimination. McDonnell Douglas, 411 U.S. at 803. To satisfy this burden, the plaintiff may rely upon the evidence presented in the *prima facie* case alone. St. Mary's Honor Center, 509 U.S. at 510.

      2.    Application

      a.    *Prima Facie* Case

Plaintiff has met the "easy to satisfy" requirements of a *prima facie* case. Tappe v. Alliance Capital Mgmt. L.P., 198 F. Supp. 2d 368, 374 (S.D.N.Y. 2001). Specifically, (1) Plaintiff is African-American and therefore a member of a protected class; (2) she had served as a stenographer since 1987 and was qualified for her position, (3) she was transferred "from her position as Stenographer/Secretary Assisting the Principal, Grade 2, to a vacant Clerk/Typist position . . ." (Pl. Mem. in Opp. at 8), and (4) she was replaced by a Caucasian. Plaintiff has therefore raised an inference of discrimination. Tarshis v. Riese Org., 211 F.3d 30, 36 (2d Cir.

2000) ("The fourth element of the *prima facie* case may be satisfied by a showing that the plaintiff's position remained open after [s]he was discharged, or that [s]he was replaced by someone outside [her] protected class.")

### b. Non-Discriminatory Reason

Defendants claim that Plaintiff was transferred because Plaintiff "was combative, insubordinate, and failed to perform many of the tasks assigned to her." (Def. Mem. in Supp. at 14). Defendants claim that Dr. Chesterton "based th[e] decision [to transfer Plaintiff] on his observation of the breakdown in the working relationship of Principal Brown . . . . Dr. Chesterton felt that it was no longer beneficial for the District for the two to continue to work together and he decided to transfer plaintiff . . . and bring in someone new to work with Principal Brown." (Id. at 15). This non-discriminatory reason satisfies Defendants' obligation under the McDonnell Douglas framework, and shifts the burden back to Plaintiff to establish that the stated reason is pretextual. See Tappe, 198 F. Supp. 2d at 374 ("[T]he prima facie case under McDonnell Douglas is easy to satisfy but also easy to defeat . . . because the defendant only bears a burden of production . . . [and] does not need to persuade the court that it was, in fact, motivated by the proffered reason.") (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000) and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-56 (1981)).

### c. Pretext

Plaintiff has identified evidence which she claims demonstrates that Defendants' proffered explanation is pretextual. Specifically, Plaintiff cites (1) the NCCSC's finding of a civil service violation, (2) Brown's comment regarding parents' fear of Mr. Robinson, (3) the

18

lack of African-Americans in high-level positions in the School District, (4) the alleged harassment and excessive scrutiny by Brown, (5) her replacement by a Caucasian, and (6) Defendants' allegedly inconsistent explanations for her transfer to the school nurse's office. However, none of these allegations, either individually or in the aggregate, suffice to demonstrate that Defendants' proffered explanation was a pretext for racial discrimination.

### 1. The Civil Service Violation

Plaintiff argues that Defendant "attempt[s] to distract this Court from the [NCCSC]'s numerous findings that the defendants committed civil services violations . . . ." (Pl. Mem. in Opp. at 11). Plaintiff further claims that "the defendants simply cannot dispute the facts that show an out-of-title assignment of [Plaintiff]." (Id. at 11, 12). However, Plaintiff's reliance on the NCCSC's determination is misguided. Specifically, while the NCCSC found that Plaintiff's placement in the School Nurse's office was out-of-title, it made no finding that it resulted from an improper racial bias or discriminatory animus. Thus, because the NCCSC's finding does not address any alleged racial discrimination, it does not satisfy Plaintiff's burden of showing that she was transferred "because of [her] race . . . ." 42 U.S.C. § 2000e-2(a)(2).

### 2. Mr. Robinson

Plaintiff cites Brown's alleged statement that parents were afraid of Robinson as evidence that racial animus was the true reason for her transfer. (Pl. Mem. in Opp. at 8). However, Brown's alleged statement regarding Robinson was entirely race-neutral, and stemmed from specific, and subsequently corrected, actions taken by Robinson. Furthermore, Brown did not state that *she* was afraid of Robinson, but rather simply relayed the fears expressed by parents of children at the school. Brown's alleged statement is therefore insufficient to demonstrate that Defendants' explanation for Plaintiff's transfer was pretextual.

19

### 3. Paucity of African-Americans

Plaintiff claims that it is "[q]uite notabl[e that] Plaintiff Deborah Davis was the only African-American Stenographer in the defendant School district." (Pl. Mem. in Opp. at 8-9). Plaintiff further cites an allegedly "disproportionately low number of African-American employees in higher positions at the defendant school district." (Id. at 1). However, the mere fact that Plaintiff was the only African American stenographer, without more, is insufficient to establish pretext. In Deleon v. Putnam Valley Bd. of Educ., 03 Civ. 10274, 2006 U.S. Dist. LEXIS 3337 (S.D.N.Y., Jan. 26, 2006), the Court rejected race discrimination claims of a current and prospective teacher who, in support of their claims, "emphasize that the [school district] employs only one black teacher." Id., at *24. The Court held that "[a]n absence of African-American teachers does not suffice to prove a *prima facie* case of discrimination without a comparison to the relevant labor pool." Id. The Court noted that "plaintiffs offer no evidence about the number of qualified African-American teachers in the relevant labor pool-- whether it be limited to Putnam County, as defendant suggests, or whether it extends throughout the metropolitan area, as plaintiffs suggest." Id. (internal quotations omitted).

Plaintiff cannot rely upon the alleged under representation of African-Americans as establishing pretext without offering some evidence linking the alleged under representation to racial discrimination. Plaintiff's allegations are thus insufficient to establish pretext.

### 4. Brown's Criticisms

Plaintiff claims that Brown subjected her to unfair scrutiny and criticism. Plaintiff alleges (1) that Brown gave preferential treatment to Caucasian employees, and (2) Principal Moller and others gave her positive evaluations, demonstrating that Brown's criticisms were unwarranted. According to Plaintiff, Brown's alleged preferential treatment of Caucasian

employees and her unfair evaluations of Plaintiff demonstrate that Defendants' proffered reason for her transfer was a pretext for racial discrimination.

However, Plaintiff has not offered any example of the alleged preferential treatment received by Caucasian employees. "On a motion for summary judgment in a discrimination case the plaintiff must provide the trial court with more than his own conclusory allegations declaring discrimination was present." Forsyth v. Fed'n Empl. & Guidance Serv., 409 F.3d 565, 573 (2d Cir. 2005). Plaintiff has also failed to rebut Defendants' claim that Brown spoke with employees other than Plaintiff regarding their performance. (Def. 56.1 Stmt. ¶¶ 14-16).[13] Plaintiff's unsupported and wholly conclusory allegations of preferential treatment therefore fail to establish pretext.

Plaintiff's claim that Principal Moller's positive evaluations prove that Brown's criticism was race-related is also insufficient to demonstrate pretext. The mere fact that Plaintiff had a better relationship with or received better evaluations from previous supervisors does not, on its own, raise an inference of discrimination. In Brown v. Time, Inc., 95-cv-10081, 1997 U.S. Dist. LEXIS 6227 (S.D.N.Y., May 7, 1997), the plaintiff claimed "his exemplary prior record with defendant and with his prior employer demonstrates that the negative reviews of his performance were a pretext for retaliation." Id., at *36. The Court rejected this claim, however, and held that "a change in management's evaluation of an employee's performance cannot by itself raise an inference of pretext." Id. (citing Viola v. Philips Med. Sys. of N. Amer., 42 F.3d 712, 717-718 (2d Cir. 1994)). The Court further held that "such an inference is even less permissible when a new supervisor is appointed, who is entitled to set his own standards and agenda." Brown, 1997

---

[13]Plaintiff states that she cannot admit or deny Defendants' claim that Brown received complaints regarding and spoke to other employees. (Pl. 56.1 Stmt. ¶¶ 14-16). This is insufficient to survive summary judgment.

U.S. Dist. LEXIS, at *37; see also Beers v. Nynex Material Enter. Co., 88-cv-305, 1992 U.S. Dist. LEXIS 240, at *32-33 (S.D.N.Y., Jan. 13, 1992) ("[I]t would be perverse to find that, if a negative review is preceded by a positive review, the negative review is necessarily false . . . . [Furthermore, a] new manager is allowed to appraise an employee's work according to his or her own expectations, even if those expectations are contrary to a prior manager's expectations."); Schuk v. Phelps Mem. Hosp. Ctr., 89-cv-5919, 1991 U.S. Dist. LEXIS 20664, at *8 (S.D.N.Y., Apr. 10, 1991) ("There exists no inference of age discrimination because [a new supervisor] conducted his own assessment of the plaintiff's work performance and determined that she was not performing it competently. A new administrator . . . may assess employee performance according to his own standards.") (citing Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985)). Brown's criticisms were race-neutral, and based on specific, and often documented instances of Plaintiff's poor performance, see, e.g., Def. 56.1 Stmt. ¶ 38; Kleinberg Decl., Ex. M.; see also Orisek v. American Inst. of Aero. & Astronautics, 938 F. Supp. 185, 191 (S.D.N.Y. 1996) ("Orisek's own disagreement with her employer's perceptions of her job performance does not satisfy her burden of showing that the Institute's proffered justification was a pretext for discrimination."), and Plaintiff has failed to offer evidence linking Brown's alleged criticisms to anything other than Brown's belief that Plaintiff was not performing adequately.

5.    Replacement by a Caucasian Stenographer

Plaintiff cites her replacement by a Caucasian stenographer as evidence supporting an inference of discrimination. While Plaintiff's replacement by a Caucasian is sufficient to raise an inference of discrimination in the *prima facie* case, it does not rebut Defendant's non-discriminatory reasons for Plaintiff's transfer. Thus, because Plaintiff has not offered any evidence showing that her successor was selected *because* she was Caucasian, the fact that she

22

*was* Caucasian, without more, is insufficient to show Defendant's proffered explanation to be pretextual.

### 6. Defendant's Inconsistent Explanations

Plaintiff claims that Defendants offered inconsistent explanations for her transfer to the school nurse's office, thereby demonstrating that the stated reasons were pretextual. According to Plaintiff, Dr. Chesterton initially "informed Plaintiff that the transfer was due to 'parental complaints' - without any elaboration despite being asked by Plaintiff." (Pl. Mem. in Opp. at 10, n. 1). According to Plaintiff, however "after the litigation commenced, the defendants added a slew of additional alleged reasons for the transfer - reasons that were not mentioned previously, such as alleged refusal to performed assigned tasks, alleged lateness, and purported insubordination." (Id.).

While Plaintiff is correct that inconsistent explanations for an adverse employment action can preclude summary judgment, EEOC v. Ethan Allen, Inc., 44 F.3d 116 (2d Cir. 1994), in this case Defendants' explanations for Plaintiff's transferred have not been inconsistent. Specifically, Dr. Chesterton testified that "I believe I indicated to Ms. Davis that I was moving her to the high school because I felt that there were problems at that school in terms of her work behavior with the principal, one being, of course, the issue of her relationships with parents that I had gotten complaints about, as well as with Ms. Brown." (Kleinberg Decl., Ex. E, 49:15-22). Plaintiff, in turn, testified that Dr. Chesterton "told me, 'This isn't working out, report to the health, high school health office tomorrow morning . . . . I asked him why . . .[and h]e told me because there - either he said parent or parent complaint. *I'm not sure what he said.*" (Kleinberg Decl., Ex. C, 337:7-8, 12-13, 20-22) (emphasis added). While Plaintiff attempts to characterize these two statements as inconsistent, it is clear that (1) Plaintiff does not recall exactly what Dr.

Chesterton said, and (2) the portion of the conversation that Plaintiff does recall is consistent with Dr. Chesterton's recollection and Defendants' non-discriminatory reason for the transfer.[14]

### D. Retaliation

Plaintiff alleges that Defendants engaged in illegal retaliation in response to her complaints regarding her transfer.[15]

#### 1. Race

"Title VII prohibits the firing of employees in retaliation for their opposition to discriminatory practices or their participation in an investigation under Title VII." Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1177 (2d Cir. 1996) (citing 42 U.S.C. § 2000e-3(a)).[16] Claims of unlawful retaliation are subject to the burden shifting analysis described in Section IV.C.1, supra. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998). In order to establish a prima facie case, Plaintiff must show "i) participation in a protected activity known to the defendant; ii) an employment action disadvantaging the plaintiff; and iii) a causal connection between the protected activity and the adverse employment action." Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995).

---

[14]Furthermore, even assuming arguendo that Plaintiff has offered evidence to demonstrate that Plaintiff's proffered explanation is a pretext, she has"produced no evidence that the [defendant's] reasons, even if pretextual, served as pretext for [improper] discrimination." Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 98 (2d Cir. 1999).

[15] Plaintiff's complaint barely satisfies the notice pleading requirements for her retaliation claim.(Cmplt. ¶¶ 2, 43, 48, 56-57, 82) (the paragraph 48 quoted herein, as well as later in this footnote, is located on page 11 of the complaint; there are also two additional paragraphs numbered '48' on page 10). Specifically, while the complaint makes several non-specific references to "retaliation" based on Plaintiff's "race, color and disability," (Id. ¶ 2), it makes only two allegations that could be construed as claiming retaliation in response to allegedly protected activity. (Id. ¶¶ 43, 48). However, the notice pleading requirements of Fed. R. Civ. P. 8 are liberal, and this Court is required to construe the allegations in a light most favorable to Plaintiff for purposes of this motion.

[16]Plaintiff's NYHRL retaliation claims are analyzed with her Title VII retaliation claims. Reed, 95 F.3d 1170, 1177 (2d Cir. 1996); see also New York State Office of Mental Retardation v. New York State Div. of Human Rights 164 A.D.2d 208, 563 N.Y.S.2d 286, 287 (3rd Dept. 1990) ("we adopt . . . the Federal standard for retaliatory discrimination cases").

There appear to be two race-based retaliation claims in Plaintiff's complaint and Memorandum of Law. First, Plaintiff appears to claim that Defendants failed to transfer her out of the School Nurse's office on account of her race. Title VII proscribes retaliation "because [an individual] has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3. Therefore, in order to assert a claim of retaliation under Title VII, Plaintiff must first identify an instance where she either (1) "opposed any practice made an unlawful employment practice by [Title VII]" or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." Id. While Plaintiff lodged various civil service and disability-related complaints in July, August and September of 2001, she has not alleged that she made any charges or complaints of racial discrimination, either formally or informally, until her October 16, 2001 filing with the NYDHR. Because civil service violations and disability claims are not protected by Title VII, Plaintiff has failed to establish that she "participat[ed] in a protected activity known to the defendant" prior to October 16, 2001. Tomka, 66 F.3d at 1308. Any claims arising out of alleged retaliatory actions taken by Defendants prior to October 16, 2001 are therefore dismissed.

Plaintiff's post-October 16, 2001 claims likewise fail satisfy the requirements of a *prima facie* case. Specifically, although Plaintiff's October 16, 2001 filing with the NYDHR constitutes a protected activity, Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002), the alleged adverse employment action of which Plaintiff complains - the Defendants' denial of her transfer request - initially took place prior to any protected activity, thereby eliminating the requisite causal nexus. Defendants denied Plaintiff's request to be transferred from her position

in the School Nurse's office as early as August 21, 2001. The fact that Plaintiff subsequently engaged in protected activity does not, without more, suffice to establish the requisite causal nexus and Plaintiff has therefore failed to establish a *prima facie* case.

Plaintiff's second Title VII retaliation claim alleges that subsequent to "Plaintiff's filing of civil service related grievances and complaints . . . Quarm refused to clarify Plaintiff's duties for her, reprimanded Plaintiff for allegedly not performing her job duties, and continued to assign Plaintiff duties that were beyond her position, with full knowledge that said duties violated civil service law." (Pl. Mem. in Opp. at 14). As with Plaintiff's first Title VII retaliation claim, the alleged adverse employment actions of which Plaintiff complains began prior to the October 16, 2001 filing. (Pl 56.1 Stmt. ¶ 157) ("From July, 2001 . . . Quarm . . . has retaliated against the Plaintiff, by writing Plaintiff up and reprimanding Plaintiff . . . ."); see also Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir.), cert. denied, 534 U.S. 951, 122 S. Ct. 348, 151 L. Ed. 2d 263 (2001). Plaintiff has failed to offer any evidence that Quarm's post-October 16, 2001 actions differed from her pre-October 16, 2001 actions, or that these alleged criticisms stemmed from anything other than Quarm's dissatisfaction with Plaintiff's work. Since Plaintiff has not demonstrated a causal link between the alleged adverse employment action and her protected activity, she has failed to establish a *prima facie* case.

### 2. Disability

Plaintiff's ADA retaliation claim is subject to the same burden shifting analysis as her Title VII retaliation claim. Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999). "In order to make out a prima facie case of retaliation, a plaintiff must show by a preponderance of the evidence [1] participation in a protected activity known to the defendant;

[2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." Slattery, 248 F.3d at 94.

Plaintiff engaged in a protected activity as early as July 23, 2001 when she allegedly complained to Dr. Chesterton regarding her transfer and advised him of her alleged disability. (Cmplt. ¶ 36); Kotcher v. Rosa & Sullivan Appliance Ctr., 957 F.2d 59, 65 (2d Cir. 1992) (holding that actions short of "filing a formal complaint with an agency or filing a lawsuit" can constitute protected activity); Bendik v. Credit Suisse First Boston (USA), Inc., 02 Civ. 9554, 2004 U.S. Dist. LEXIS 5750, at *31 (S.D.N.Y., Apr. 5, 2004). However, Plaintiff has failed to establish a causal link between the alleged adverse employment actions and her complaints. Specifically, Plaintiff has failed to offer *any* evidence indicating that Quarm's alleged criticisms and refusals to clarify were in any way related to Plaintiff's complaints regarding her alleged disability. Furthermore, as discussed above, the Second Circuit in Slattery made clear that temporal proximity does not automatically satisfy the causality requirement. Slattery, 248 F.3d at 95. Plaintiff has offered no evidence indicating that Quarm's evaluations of or interactions with Plaintiff were the result of retaliation for Plaintiff's complaints of disability. Plaintiff has therefore failed to establish a *prima facie* case or retaliation based upon her disability complaint.

E.    Breach of Contract

Plaintiff's Eighth Cause of Action asserts a claim of breach of contract. (Cmplt. ¶¶ 95-102). Defendants move for dismissal on the grounds that (1) "an employee subject to [a collective bargaining] agreement may not sue the employer directly for breach of contract," (Def. Mem. in Supp. at 18), and (2) Defendants' anti-discrimination employment policies and manuals do not serve as a valid basis for a breach of contract claim. (Def. Rep. Mem. in Supp. at 14).

27

"When an employer and a union enter into a collective bargaining agreement that creates a grievance procedure, an employee subject to the agreement may not sue the employer directly for breach of that agreement but must proceed, through the union, in accordance with the contract." Board of Education v. Ambach, 70 N.Y.2d 501, 508, 517 N.E.2d 509, 512, 522 N.Y.S.2d 831, 834 (1987). To the extent that Plaintiff claims that the collective bargaining agreement is invalid because it "purport[s] to waive an employee's right to a federal forum in an action based on federal employment discrimination statutes" (Pl. Mem. in Opp. at 23) (quoting Fayer v. Town of Middlebury, 258 F.3d 117 (2d Cir. 2001), Defendants have challenged Plaintiff's claims under the federal employment discrimination statutes on the merits, and cite the collective bargaining agreement as only a defense against Plaintiff's claims sounding in contract.[17]

Furthermore, it is equally well-established that an employer's anti-discrimination policies and manuals cannot serve as the basis for a breach of contract claim. As the First Department has explained, a "general statement of equal opportunity and nondiscrimination contained in an employee handbook . . . is nothing more than a statement of existing law concerning discrimination, [and] may not serve as a basis for a breach of contract claim." Blaise-Williams v. Sumitomo Bank, Ltd., 189 A.D.2d 584, 586 (1st Dep't 1993); see also Odunmbaku v. New York Blood Ctr., 95 Civ. 6747, 1996 U.S. Dist. LEXIS 13182, at *7-8 (S.D.N.Y., Sept. 10, 1996); Kearney v. Pyramid Mgmt. Group, Inc., 98-CV-0531E, 2000 U.S. Dist. LEXIS 7912, at

---

[17]Plaintiff also asserts that "Plaintiff's breach of contract claim requires a finding that Defendants did, in fact, discriminate against Plaintiff." (Pl. Mem. in Opp. at 23). The Court is unclear exactly what Plaintiff is claiming, but to the extent she is seeking to incorporate her statutory discrimination claims into her contract claim, such an argument is plainly meritless.

*24-25 (W.D.N.Y., Jun. 5, 2000). Therefore, Plaintiff's breach of contract claims based on the employment manuals and policies are dismissed.

V.    Conclusion

For the reasons stated above, Defendants' motion for summary judgment is GRANTED. The Clerk of the Court is directed to close this case.


IT IS SO ORDERED.


Sandra J. Feuerstein
United States District Judge

Dated: March 7, 2006
Central Islip, New York

To:

Frederick K. Brewington
Law Offices of Frederick K. Brewington
50 Clinton Street, Suite 501
Hempstead, NY 11550

Bruce R. Calderon
Adam Kleinberg
Steven Verveniotis
Miranda & Sokoloff, LLP
240 Mineola Blvd.
Mineola, NY 11501